1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   Melvin Patterson,                        No. 2:21-cv-02398-KJM-AC

12              Plaintiff,                     ORDER

13        v.

14   Six Flags Theme Parks, Inc., et al.,

15              Defendants.

16

17        The Americans with Disabilities Act of 1990 (ADA) was passed nearly thirty-five years

18   ago to ensure people with disabilities have "equality of opportunity, full participation,

19   independent living, and economic self-sufficiency."  42 U.S.C. § 12101(a)(7).  Six Flags Theme

20   Parks, Inc., Six Flags Entertainment Corp., and Park Management Corp. (collectively,

21   defendants)[1] seem not to have understood their obligations under the ADA, even after all these

22   years.  Melvin Patterson, a person who is deaf, brought this action because defendants did not

23   provide him with an American Sign Language (ASL) interpreter when he visited with his family.

24   He seeks an injunction under Title III of the ADA, 42 U.S.C. 12181 *et seq.*, and damages under

---

[1]  Neither defendants nor plaintiffs have made an issue of the differences, if any, between these three corporate defendants.  Further, Rudie Baldwin appeared "on behalf of defendants" and did not attempt to differentiate the respective responsibilities of his corporate clients at trial.  Trial Tr. Day One at 4:7–8.  The court will thus treat the defendants identically in this order.

1

1  California's Unruh Civil Rights Act (Unruh Act), Cal. Civ. Code § 51.  The parties tried the case

2  to the court in a bench trial in September 2024.

3      While the court originally had contemplated directing the prevailing party to propose

4  findings of fact and conclusions of law, upon reflection it has determined it is able to resolve the

5  fundamental factual and legal issues here.  As set forth more fully below in these findings of fact

6  and conclusions of law, Patterson proved that defendants are liable for violations of the ADA and

7  Unruh Act.  He is entitled to damages and attorneys' fees as well as equitable relief, which the

8  court will formally order on a future date as explained in the conclusion of this order.

9  ## I.   THE COURT'S ROLE AND DUTIES

10      In cases tried without a jury, the Federal Rules require the trial court to "find the facts

11  specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1).  If the court does

12  not state its findings and conclusions on the record at the close of evidence, it must prepare "an

13  opinion or memorandum of decision." *Id.*  The court's findings must be "explicit enough" to offer

14  a "clear understanding" of its decision. *Colchester v. Lazaro*, 16 F.4th 712, 717 (9th Cir. 2021)

15  (quoting *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1090 (9th Cir. 2002)).

16      District courts often present their factual findings in numbered lists, but Rule 52 does not

17  require that format.  Numbered factual findings can be "cumbersome" or even counterproductive,

18  especially when the court must answer mixed questions of law and fact.  *Appleton Papers Inc. v.*

19  *George A Whiting Paper Co.*, No. 08-C16, 2012 WL 2704920, at *1 n.1 (E.D. Wis. July 3, 2012),

20  *aff'd*, 768 F.3d 682 (7th Cir 2014).  After reviewing the record here and the evidence presented at

21  trial, the court has determined it can issue this order without seeking proposed findings and

22  conclusions from the prevailing party.  The court also has determined that a narrative

23  presentation, supported by citations when necessary, will explain its findings and conclusions

24  most clearly.

25  ## II.   FINDINGS OF FACT

26      Melvin Patterson has been deaf since he was eighteen months old.  Trial Tr. Day One at

27  30:16, ECF No. 82.  He resides in Patterson, CA, with his wife, who is also deaf, and his two

28  children, who are not.  *Id.* at 30:21–23.  He and his family enjoy amusement parks.  See *id.* at

32:19–22.   They have visited Six Flags, Disneyland, Knots Berry Farm, and Legoland in the recent past.  *Id.* at 63:2–15, 70:13–16.

For many of these visits, Patterson has asked for an interpreter.  *Id.* at 50:17–25. Interpreters allow Patterson to communicate with others in real time.  *Id.* at 31:13–18.  With an interpreter present, Patterson can better enjoy shows and other predominantly verbal forms of entertainment.  *Id.* at 38:22–25.  Interpreters can also communicate to Patterson safety messages and other notifications the parks make over loudspeakers.  *Id.* at 36:23–25.  Interpreters make Patterson feel included.  *Id.* at 31:17.

Generally, the amusement parks he has visited have accommodated Patterson's requests. *Id.* at 50:17–23.  Several of the parks have provided interpreters, including Six Flags Discovery Kingdom in 2010, when Patterson visited for Deaf Awareness Day.  *Id.* at 41:17–21.  Parks have not always been able to provide an interpreter.  Disneyland, for example, could not accommodate Patterson's request for an interpreter because Patterson made the request at the last minute.  *Id.* at 68:13–17.  But the park did provide Patterson with a device that allowed him to have a more interactive experience while he was visiting.  *Id.* at 51:2–3.

On June 4, 2021, Patterson bought Gold Plus memberships online from defendants so he could take his family to Six Flags Discovery Kingdom in Vallejo, California, to celebrate his daughter's upcoming ninth birthday on June 6.  *Id.* at 32:19–25.  Gold Plus memberships gave Patterson and his family access to the park as well as other privileges.  Joint Ex. 1 at PLA 13–17. The contract for the membership was for at least twelve months.  *Id.* at PLA 14.  Additionally, Patterson purchased parking and dining passes and made deposits for his memberships.  *Id.* at PLA 12.

Before visiting, Patterson learned accommodations were unavailable.  He called Six Flags several times on June 4, 2021, and left messages asking for accommodations for his upcoming visit with his family.  Trial Tr. Day One at 35:6.  Six Flags never called him back.  *Id.* at 35:14. While at the park, Patterson inquired again with guest relations about accommodations.  Pl. Ex. 1 at PLA 115.  Once again, he was denied accommodations.  Trial Tr. Day One at 35:24–25, 36:4–7, 14.  Guest relations told Patterson to call Six Flags for requests for accommodations.  *Id.* at

3

36:5–7.  Patterson and his family decided to remain at the park on June 6 because his daughter could not contain her excitement about the trip.  *Id.* at 36:18–19.  He did not enjoy the day.  He was frustrated he could not understand the announcements Six Flags was making over the loudspeakers and did not get to enjoy the shows being put on at the park.  *Id.* at 36:23–37:2.

Several days later, Patterson began a long and frustrating march through defendants' customer service operations.  *Id.* at 37:5–6.  On June 9, he contacted defendants at their guest relations account to complain about his lack of accommodations and to request a refund of his memberships.  Pl. Ex. 1 at PLA 115.  He received an automated response that told him his case was numbered 02871479.  Pl. Ex. 1 at PLA 115; Joint Ex. 2 at PARK 2.  On June 11, he tried again with the same result.  He received an automated email that gave him a new case number: 02882815.  Joint Ex. 2 at PARK 5.  Patterson then heard nothing from Six Flags until July 31, 2021.  Joint Ex. 1 at PLA 38.  Internally, Six Flags' only action during this lag time was to combine Patterson's cases together into one.  Joint Ex. 2 at PARK 8.  On June 11, 2021, Patterson was so frustrated that he sought a refund from Six Flags by contesting his purchase through his credit card company.  Pl. Ex. 1 at PLA 116.  The credit card company declined his request on July 29.  *Id.*

When Six Flags did communicate again with Patterson, his frustration only mounted.  On July 29, 2021, a Six Flags support agent named Ava contacted Patterson but only to answer a question about whether Patterson could use his Gold Plus membership to buy discounted tickets at another Six Flags theme park.  Joint Ex. 1 at PLA 39.  The email made no mention of Patterson's complaints regarding lack of accommodations or his desire for a refund.  *Id.*  When Patterson questioned Ava over these omissions by email, she apologized and told Patterson she "escalated" the request for a cancellation to the "right department."  *Id.* at PLA 41.  Another delay followed.  Finally, on August 19, 2021, a different support agent named Angelica responded to Patterson's complaints.  *Id.* at PLA 54.  But Angelica only referred Patterson to Six Flags' cancellation policy for Gold Plus memberships:  cancellations were not allowed for the first twelve months.  *Id.*  When Patterson pointed out in a reply email to Angelica that he had received no response to his protests over lack of accommodations, silence followed for another six days.

4

*Id.* at 57.  Then another—the third—support agent, April, responded to Patterson on August 25. *Id.* at PLA 58.  April reiterated that Patterson could not cancel his membership and directed him to a weblink for more information on Six Flags' ADA policies (https://static.sixflags.com/website/files/sfdk_ada-guidelines.pdf).  *Id.*  The next day, a fourth guest services agent, Yulanda, emailed Patterson a new case number: this time he was number 03127493.  *Id.* at PLA 60.

Patterson's attempts to reach Six Flags by phone were even less successful.  After he attempted to follow up on her email via phone, Yulanda hung up on him.  *Id.* at PLA 64.  On another occasion, he was put on hold for over an hour before the line was disconnected.  *Id.* at PLA 66.  Patterson testified to his frustration as a result of all of his experiences with Six Flags' support staff.  Patterson became so frustrated that, by at least August 28, he had retained legal counsel and sought to make a formal complaint.  *Id.* at PLA 75.

When Six Flags' staff finally answered Patterson's concerns over accommodations, they provided a confusing array of responses.  On August 26, a support agent named Vibert—the sixth agent Patterson interacted with—informed Patterson of Six Flags' "Attractions Access Pass," an accommodation that mostly allows people with disabilities to reserve times to ride rides instead of having to wait in line.  *Id.* at PLA 63; Joint Ex. 2 at PARK 89.  Two days later, and eighty-five days from the time Patterson first requested accommodations, Juliana Garza—representative number seven—told Patterson he would be provided interpreters if he gave the park seven days' notice and to call the park's operations office at (707) 556-5377.[2]  Joint Ex. 1 at PLA 76.  Garza's advice accurately reflected Six Flags' policy towards providing ASL interpreters in its then-operative Safety and Accessibility Guide.  *See* Joint Ex. 2 at PARK 90.

Patterson did as Ms. Garza instructed.  On September 6, 2021, Patterson called Six Flags Discovery Kingdom via Video Relay Service and spoke with Mercedes Wilson, a guest relations manager.  Joint Ex. 1 at PLA 102–109, Defs. Trial Br. at 3, ECF No. 68.  Patterson requested an interpreter for an upcoming visit on September 11.  Joint Ex. 1 at PLA 102.  Wilson replied,

---

[2]  Patterson testified that when he visited the park on June 6, he was provided a number by guest relations beginning with 707, but he did not recall the full number.  Trial Tr. Day One at 36:5–11.

1  "[W]e can't provide an interpreter, but if you bring an interpreter, then that interpreter will be

2  given a ticket in the park." *Id.* at PLA 103.  Patterson asked if he could make the request in email

3  to avoid any confusion.  *Id.*  Wilson declined Patterson's invitation: "[W]e don't need an

4  explanation." *Id.* at PLA 104.  After Patterson challenged Wilson on whether she knew Six

5  Flags' policy on providing interpreters, Wilson told him, "[S]omeone more senior will call you

6  back." *Id.* at PLA 108.  Wilson's response, that Six Flags would not provide an ASL interpreter,

7  but only provide a ticket for one, did not accurately reflect Six Flags' policy.  *See* Joint Ex. 2 at

8  PARK 90.  Rather, her advice reflected information regarding a different accessibility program,

9  i.e., Six Flags' Personal Care Attendant Program, not its ASL interpreter policy.  *See Id.* at PARK

10 89.

11       No one with Six Flags corrected Wilson's mistake.  Neither she nor anyone else from Six

12 Flags Discovery Kingdom ever called Patterson back.  Trial Tr. Day One at 58:11–13.  Further,

13 when Patterson emailed Garza after his phone call with Wilson, Garza did not help him set up an

14 interpreter.  Joint Ex. 1 at PLA 88.  Instead, Garza appeared to confirm Wilson's opinion that

15 interpreters could not be provided.  Specifically, Garza told Patterson, "[Y]ou can bring an

16 interpreter as a [Personal Care Attendant]."  Joint Ex. 1 at PLA 87.  After another exchange of

17 emails the next day, Garza wrote to Patterson, "If you have spoken to the park and they have

18 directed you to bring your own interpreter, then we may not have an interpreter of our own

19 available at the time." *Id.* at PLA 91.  In sum, over the course of three months, defendants

20 ignored Patterson's emails, directed Patterson to three different policies, gave him contradictory

21 instructions, and never offered to provide an interpreter or other assistive device for upcoming

22 visits to Six Flags Discovery Kingdom.

23       Patterson's requests for accommodations were consistent and clear.  In one of the last

24 email exchanges on September 7, 2021, Patterson emailed defendants at both their corporate and

25 guest relations emails that he would like ASL interpreters for upcoming visits on September 11,

26 September 25, October 2, October 16, October 31, November 13, and November 27. *Id.* at PLA

27 89.  All but his first request met Six Flags' seven-day notice requirement.  *See* Joint Ex. 2 at

28 PARK 56.

1      Patterson's frustrating experience was born of a series of bad communications with Six

2   Flags' employees.  Most of his interactions with Six Flags were through the company's national

3   call center.  Jeremy Bushek, the manager of the national call center, testified forty people work

4   onshore for the center and fifty offshore.  Trial Tr. Day Two at 50:11, ECF No. 83.  Many of

5   these workers are either support agents or job coaches.  Garza Dep. at 13, ECF No. 76-1.[3]

6   Support agents take "phone calls, e-mails, and then chats" from customers across the country

7   inquiring about Six Flags' policies.  *Id.*  at 10.  Agents are instructed to answer as best they can

8   from the written manuals and policies of Six Flags.  *Id.* at 11.  Six Flags refers more difficult or

9   "escalated" clients upward from support agents to "job coaches."  *Id.*  Job coaches are not

10   supervisors.  *Id.*  Both support agents and job coaches are expressly not allowed to communicate

11   directly with any employee who works on site at a given Six Flags park.  *Id.* at 16; Trial Tr. Day

12   Two at 58:12–59:1.  Only supervisors are allowed to communicate with parks staff.  Trial Tr. Day

13   Two at 59:2–3.

14      Juliana Garza, a job coach at the time she communicated with Patterson, was not a

15   supervisor, but she held herself out to customers as an "operational supervisor."  Garza Dep. at

16   13.  She represented herself in this way to Patterson when she communicated with him in 2021.

17   *See* Joint Ex. 1 at PLA 66, 69, 71, 72, 75, 76.  Not one of the Six Flags call center representatives

18   Patterson communicated with actually had the authority to contact employees who worked onsite

19   at Six Flags Discovery Kingdom.  And not one of them ever communicated with a supervisor at

20   the call center regarding Patterson's request for accommodations.  Trial Tr. Day Two at 61:2–12.

21      Patterson's communications with employees at Discovery Kingdom were similarly

22   wanting.  For example, when Mercedes Wilson communicated with Patterson in September 2021,

23   she was under the direct supervision of Dylan Clayton, the operations manager at Discovery

24   Kingdom and the person in charge of ensuring that theme park's compliance with the ADA.  *Id.*

25   at 127: 16–18.  Clayton and Wilson worked in the same office.  *Id.*  Yet the record does not show

---

[3] The court has granted the parties' stipulated request to allow parts of Juliana Garza's deposition in as evidence in lieu of live testimony.  *See* Trial Tr. Day One at 14:24–16:16, 141:19–143:11; Trial Tr. Day Two at 47:14–49:9.

the two ever communicated about Patterson's request for an ASL interpreter. *Id.* at 133:5–7.  The

record does not show Clayton ever personally communicated with Patterson in September 2021.

Training at Six Flags also fell short.  Staff at both the national call center and at Discovery

Kingdom received minimal training regarding accommodation requests.  Garza, for example,

testified she was instructed "to refer the guest to the accessibility manual" when answering

questions regarding accommodations.  Garza Dep. at 46.  Garza did not recall being trained on

Six Flags' sign language interpreter policy.  *Id.*  Bushek testified call center employees were not

required to read the safety and accessibility guide.  Trial Tr. Day Two at 87:23–88:1.  They were

simply directed to consult the guide on the spot when guests had questions related to accessibility

or safety.  *Id.* at 58:2–11.  Similarly, Wilson was trained only to look in the safety and

accessibility guide to find answers to questions.  *Id.* at 30:1.  Clayton testified she believes Six

Flags should make a good faith effort to provide guests with accommodations, but that belief is

not expressed in the accessibility guide, and no evidence shows Six Flags trained employees to

make such a good faith effort, or to be able to make good on such a good faith belief.  *See id.* at

119:3–121:2.

Six Flags elicited witness testimony to the effect that its training and communication has

improved since 2021.  Alexander Neuzil, the operations manager for Discovery Kingdom since

September 27, 2021, testified that Six Flags has updated its accessibility guide: the guide now has

an email address guests can contact if they want to schedule ASL services.  *Id.* at 165:6; *see also*

Def. Ex. A at 7.  Patterson sent a message to this email in the summer of 2024 when

contemplating accommodations for a new visit to Six Flags Magic Mountain.  Trial Tr. Day Two

at 167:7–14.  A Six Flags representative reached out to Patterson for further details to help plan

his visit, but Patterson ultimately declined to visit the park.  *Id.* at 167:18–21.  Staff also has

undergone more in-depth training on the Accessibility Guide after Neuzil's arrival.  *Id.* at 169:8–

13.  However, Neuzil still was not able to point to any training specific to accommodation

requests.  *See id.* at 177:17–25.  Nor has Six Flags' policy of barring call center employees from

communicating with staff at individual parks changed.  *Id.* at 58:12–59:1.

1    **III.    CONCLUSIONS OF LAW**

2          **A.      Standing**

3          At the pleadings stage, the court found Patterson had standing to pursue his case.  *See*

4    Order Denying Mot. To Dismiss at 5–8, ECF No. 25.  Defendants have now renewed their

5    argument that Patterson does not have standing.  *See* Defs.' Trial Br. at 5–12.  The court now

6    resolves the matter on the trial record.

7          To demonstrate standing, plaintiffs must show (1) they have suffered a concrete and

8    particularized injury-in-fact, which is actual or imminent, not conjectural or hypothetical;

9    (2) there must be a causal connection between the injury and the defendant's conduct; and (3) the

10   injury will likely be redressed by a favorable decision.  *Pritikin v. Dep't of Energy*, 254 F.3d 791,

11   796–797 (9th Cir. 2001).  Additionally, "to establish standing to pursue injunctive relief, which is

12   the only relief available to private plaintiffs under the ADA, [a plaintiff] must demonstrate a real

13   and immediate threat of repeated injury in the future."  *Chapman v. Pier 1 Imports* (*U.S.*) *Inc.*,

14   631 F.3d 939, 946 (9th Cir. 2011) (citation and internal marks omitted).  "Where the harm alleged

15   is directly traceable to a written policy . . . there is an implicit likelihood of its repetition in the

16   immediate future."  *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004)

17   (citations and internal marks omitted).  "The party asserting federal jurisdiction bears the burden"

18   of demonstrating they have standing "at every stage of the litigation."  *Krottner v. Starbucks*

19   *Corp.*, 628 F.3d 1139, 1141 (9th Cir. 2010).

20         Patterson has standing.  On nine occasions, Patterson requested accommodations and on

21   nine occasions defendants denied any kind of accommodation to him.  Trial Tr. Day One at 35:6,

22   24–25, 36:24; Joint Ex. 1 at PLA 89.  Consequently, Patterson did not receive any

23   accommodations and was not able to fully enjoy the park when he visited on June 6, 2021, and

24   was deterred from returning to Six Flags Discovery Kingdom that autumn.  *Id.*  Defendants

25   caused Patterson's injuries through their policies and those injuries can be redressed by this court

26   through damages and injunctive relief.  Further, Patterson continues to face imminent risk of

27   future injury because, as explained further below, defendants' policies remain.  *See Fortyune*,

28   364 F.3d at 1081.

Defendants renew two arguments in particular relating to standing.  First, defendants argue Patterson has not alleged an injury-in-fact because he did not properly follow Six Flags' policy for requesting ASL interpreters.  Defs. Trial Br. at 9–12.  Patterson proved at trial that he made timely requests for accommodations when he emailed guest relations at Six Flags for accommodations on seven future dates, all of which exceeded defendants' seven-day notice policy.  *See* Joint Ex. 1 at PLA 89.  More fundamentally, defendants have never explained how or why a person's failure to follow corporate policies could deprive that person of constitutional standing to seek relief in federal court.  As noted more fully below, the defendant must show, as an affirmative defense, that being forced to not follow its corporate policy would constitute an "undue hardship."  *Cf. US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002) (where defendant argued not being allowed to follow its seniority policy would constitute an undue hardship).

Second, defendants argue Patterson has not alleged an immediate threat of repeated future injury sufficient to establish a need for injunctive relief.  Defs. Trial Br. at 5–9.  But the court finds Patterson has shown he faces an imminent threat of future injury.  Patterson testified credibly that he and his family like theme parks as a form of entertainment and he wants to go back to Six Flags Discovery Kingdom in the future.  Trial Tr. Day One at 62:1–16.  In fact, he has returned since his first visit here.  *Id.*  He will likely be injured in the same way as before given that defendants have not changed their policies.  *See id.*  Six Flags still requires a seven-day advance notice before ASL interpreters can be provided.  *See* Joint Ex. 3 at 7.  Workers at the national call center are still not allowed to contact the park directly.  Trial Tr. Day Two at 58:12–59:1.  Defendants have introduced unconvincing evidence that their employees have received more specific training since 2021 regarding the proper handling of ASL or other ADA requests.  *See id.* at 169:8–13, 177:17–25.  Patterson's past harms derived from defendant's challenged policies and still "are likely to recur."  *Fortyune*, 364 F.3d at 1081.

Defendants' argument that their policies have changed relies primarily on the testimony of Alexander Neuzil, who began to oversee operations of Six Flags Discovery Kingdom in late September 2021.  *Id.* at 164:18.  As noted above, Neuzil testified Six Flags Discovery Kingdom provided more general training on the Accessibility Guide to all its employees after he arrived.

1  *Id*. at 169:8–13.  He further testified he set up a new email account that is advertised to customers

2  in the updated Six Flags Safety and Accessibility Guide available on Six Flags' website.  *Id.* at

3  165:6; Joint Ex. 3 at 7.  He testified the email account better enables communication between

4  customers in need of accommodations and Six Flags staff.  Trial Tr. Day Two at 166:11–67:2.

5  Neuzil points out that Patterson himself used the email account in the summer of 2024 to request

6  accommodations for an upcoming visit to Six Flags Magic Mountain.  *Id.* at 167:7–14.

7        These changes, even if reflecting an incremental improvement, do not show Patterson no

8  longer faces an imminent threat of legal harm.  As explained above, Six Flags still follows the

9  same policies that led to his injury.  Moreover, one example of a successful accommodation does

10  not eliminate all imminent threats of future injury, given that defendants' policies and practices

11  remain overall the same.  *See Fortyune*, 364 F.3d at 1081 (plaintiff had returned to same place he

12  had suffered an ADA injury without problems, but still had standing because defendants' policies

13  had not changed).

14        For all of these reasons, Patterson has standing to bring his claims.  Deciding standing,

15  however, does not fully resolve substantive claims on the merits, even when the standing analysis

16  overlaps with the merits analysis.  *See e.g.*, *Magadia v. Wal-Mart Associates, Inc.*, 999 F.3d 668,

17  680 (9th Cir. 2021) (upholding district court's finding of standing at bench trial but determining

18  plaintiffs had not won on the merits).

19       **B.**    **ADA and Unruh Act Claims**

20        Patterson brings two substantive claims, one under Title III of the ADA, 42 U.S.C.

21  § 12181, and the second under California's Unruh Civil Rights Act, Cal. Civ. Code § 51.  Both

22  claims are based on the nine times defendants failed to provide accommodations for Patterson's

23  planned trips to Six Flags Discovery Kingdom: twice in June 2021, when Patterson was denied

24  any accommodations for his June 6 visit to Six Flags Discovery Kingdom, and seven times later

25  in the year, when in September he emailed about his plans to visit Discovery Kingdom in

26  September, October and November.  Pl. Trial Br. at 22, ECF No. 67.  Because a violation of Title

27  III of the ADA also constitutes a violation of the Unruh Act, *see* Cal Civ. Code § 51(f), the court

28  will analyze Patterson's claims together.

1          To prove a violation of Title III of the ADA, plaintiffs must show (1) they are disabled;

2    (2) the defendant is a private entity that operates a place of public accommodation; and (3) the

3    defendant denied public accommodations on account of the plaintiffs' disability.  *Arizona ex rel.*

4    *Goddard v. Harkins Amusement Enters. Inc.*, 603 F.3d 666, 670 (9th Cir. 2010) (citing *Molski v.*

5    *M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007)).  Intent is not an element of an ADA claim.

6    *See Lentini v. Cal. Center for the Arts, Escondido*, 370 F.3d 837, 846 (9th Cir. 2004).  Nor is

7    intent an element of an Unruh Act claim predicated on an ADA violation.  *See Munson v. Del*

8    *Taco*, *Inc.*, 46 Cal. 4th 661, 670 (2009).

9          The parties have stipulated that Patterson qualifies as a person with disabilities under the

10    meaning of the ADA and that defendants are private entities that operate places of public

11    accommodation.  *See* Order on Mot. To Dismiss at 9, ECF No. 35; Trial Tr. Day Two at 192: 9–

12    17.  Thus, the only dispute for the court to resolve is whether defendants deprived Patterson of

13    public accommodations in light of his disability.

14          The ADA defines discrimination as the "failure to take such steps as may be necessary to

15    ensure that no individual with a disability is excluded, denied services, segregated, or otherwise

16    treated differently . . . because of the absence of auxiliary aids and services . . . ."

17    42 U.S.C. § 12182(b)(2)(A)(iii).  The ADA provides examples of "auxiliary services," which

18    include "qualified interpreters or other effective methods of making aurally delivered materials

19    available to individuals with hearing impairments."  42 U.S.C. § 12103(1)(A).

20          Patterson proved at trial he was excluded from fully enjoying Six Flags Discovery

21    Kingdom because defendants twice in June did not provide auxiliary services, whether an

22    interpreter or handheld auxiliary device.  *See* Trial Tr. Day One at 35:6, 14, 24–25, 36: 4–7, 14.

23    Patterson testified he could not enjoy the shows at Six Flags when he visited for his daughter's

24    birthday on June 6.  *See id*. at 37:2.  He did not feel fully included while he was there.  *See id*. at

25    36:23–37:2.  And he could not hear any announcements made over the park's loudspeaker

26    system.  *See id*.  Further, in September, Six Flags provided him incorrect information about how

27    to obtain an interpreter for his upcoming visits.  *See* Joint Ex. 1 at PLA 102–08.  Neither Wilson

28    nor Garza helped arrange for accommodations for Patterson for his planned September visits.  *See*

*id.* at 91, 102–08.  Nor did anyone help Patterson obtain accommodations for his proposed visits in October or November.  *See* Trial Tr. Day One at 58:11–13.  The court finds Six Flags denied Patterson accommodations on nine occasions.

Defendants blame Patterson for his difficulties.  They argue he did not provide Six Flags Discovery Kingdom with seven days' notice before requesting an ASL interpreter.  *See* Trial Tr. Day Two at 214:21–215:9.  Defendants also argue that Patterson did not call the right phone number.  *Id.* at 219:14.  They argue Mercedes Wilson's advice to Patterson was just a singular case of negligence and not an outcome derived from Six Flags' deficient policies.  *See id.* at 217:1–24.  They even go so far as to argue Patterson failed to correct their own employee, Mercedes Wilson, regarding the proper policy when he spoke with her over the phone in September 2021.  Trial Tr. Day One at 121:12–124:14.  Fundamentally, they say they did not intend to discriminate against Patterson and that his troubles are a result of his own shortcomings in advocating for himself.  *See id.*

The ADA does not impose the kind of requirements or limitations defendants attempt to read into it.  Corporate policies—like Six Flags' seven-day notice requirement—are not the law. Instead, it is defendants who have the burden to show providing ASL interpreters on shorter notice than seven days would constitute an "undue burden."  *See* 42 U.S.C. § 12182(b)(2)(A)(iii). Regulations permit a defendant to show a requested accommodation would be too financially burdensome based on the cost of the accommodation or the defendant's overall financial resources.  *See* 28 C.F.R. § 36.104.  But defendants offered no such evidence at trial.  They abandoned their undue burden defense altogether.  Trial Tr. Day Two at 3:22–4:4.  On this record, Six Flags' seven-day advance notice requirement is no defense to discrimination.

Six Flags' accusations that Patterson was at fault for not understanding their policies require even less analysis.  It is not Patterson's burden to train defendants' employees.  Even if Patterson did not always call the right phone number, he did contact at least eight Six Flags employees during the summer of 2021.  Wilson's misstatement was not an isolated case of negligence either, as only one employee, Garza, seemed aware of the correct policy, and she could not even help Patterson obtain accommodations because she was not allowed to contact the

1  park. Garza Dep. at 14.  Patterson's experience with these insufficiently trained employees

2  supports his requested injunctive relief.  Finally, defendants' intent is irrelevant because it is not

3  an element of an ADA claim or an Unruh Act claim predicated on an ADA claim.  *See Lentini*,

4  370 F.3d at 846; *Munson*, 46 Cal. 4th at 670.

5       The court finds defendants liable under the ADA and under the Unruh Act.

6  **IV.  REMEDIES**

7       Patterson seeks actual damages, statutory damages, declaratory relief, attorneys' fees and

8  an injunction.  The court considers each request in turn.

9       **A.  Actual Damages**

10       Under the Unruh Act, plaintiffs can receive actual damages, defined as "special and

11  general damages."  Cal. Civ. Code § 52(a), 52(h).  Special damages are "the out-of-pocket losses

12  peculiar to the infliction of each respective injury."  *Licudine v. Cedars-Sinai Med. Ctr.*, 3 Cal.

13  App. 5th 881, 892 (2016) (citations and internal marks omitted).   For special damages, the court

14  finds Patterson spent $6.60 on an initial deposit for his Gold Pass membership on June 4, 2021.

15  Joint Ex. 1 at PLA 6.  Further, Patterson made twelve payments of $16.94 for his Gold Pass

16  membership, for a total of $203.28.  *See id.* at PLA 13.  Because Patterson could not effectively

17  use his Gold Pass membership, he is entitled to $209.88 in economic damages.

18       Patterson also requests general damages.  "General damages include damages for pain and

19  suffering, emotional distress, and other forms of detriment that are sometimes characterized as

20  subjective or not directly quantifiable."  *Licudine*, 3 Cal. 5th at 892 (citations and internal

21  marks omitted).  "One of the most difficult tasks imposed on a fact finder is to determine the

22  amount of money the plaintiff is to be awarded as compensation for pain and suffering."  *Pearl v.*

23  *City of Los Angeles*, 36 Cal. App. 5th 475, 491 (2019) (citation omitted).  Federal district courts

24  often have considered jury verdicts in roughly comparable cases when settling on an appropriate

25  award of pain and suffering damages.  *See, e.g., Estevez v. United States*, 72 F. Supp. 2d 205,

26  208–211 (S.D.N.Y. 1999).  This court will do the same, relying on the following findings to

27  identify appropriate comparators:

- Patterson requested and was denied public accommodations at Six Flags Discovery Kingdom on nine occasions.
- Patterson experienced humiliation and anguish because of these denials.
- Patterson did not prove defendants intentionally denied him services.

Damages awards from recent cases in California vary from tens of thousands to hundreds of thousands of dollars.[4]  After reviewing the cases, the court finds that a damages award of $18,000, or $2,000 per violation, suffices to compensate Patterson.  The denial of accommodations in this case was less severe than in *Briteramos,* 2019 WL 13252466, than in *Connelly*, 2007 WL 5463484, and in *Mitchell*, 2002 WL 31911041, as those cases involved intentional discrimination.  This case is most like *Rodriguez*, where the plaintiff experienced emotional distress after not being able to access a restaurant.  10 F. Supp 3d. (N.D. Cal. 2014).  Here, by contrast, Patterson made multiple unheeded requests for accommodation.  Pl. Trial Br. at 22.  Thus, he deserves a higher award than the $12,000 damages award in *Rodriguez*.

In total, Patterson is entitled to $18,209.88 in actual damages.

### B.    Statutory Damages

Patterson also requests statutory damages.  Under the Unruh Act, plaintiffs can receive statutory damages of up to three times the amount of their actual damages but not less than $4,000.  Cal. Civ. Code § 52(a).  Plaintiffs are eligible to receive statutory damages for "each and every offense."  *Id.*  Here, Patterson has proven defendants violated the Unruh Act nine times.  Patterson thus may receive $4,000 for each violation, totaling $36,000 in statutory damages.

---

[4] *See e.g., Briteramos v. King's of Cuts*, No. 2:18-cv-06400, 2019 WL 13252466 (C.D. Cal. Mar. 18, 2019) ($25,000 in pain and suffering damages for being refused service for having HIV); *Rodriguez v. Barrita*, 10 F. Supp 3d. 1062 (N.D. Cal. 2014) (granting $12,000 in actual damages for plaintiff who could not access restaurant with wheelchair); *Anderson v. Tran*, JVR No. 1505290037, 2014 WL 9860448 (L.A. Sup. Ct. Dec. 9, 2014) ($125,000 in pain and suffering damages because defendant denied plaintiff access to supermarket multiple times due to plaintiff's service animal); *Connelly v. Twilight Zone and Fel Prop. II, LLC*, No. CGC-06-452101, 2007 WL 5463484 (S.F. Cty. Sup. Ct. Dec. 26, 2007) ($35,000 settlement in case where plaintiff with wheelchair claimed inability to access store); *Mitchell v. Soleyman*, 49 Trials Dig. 5th, 2002 WL 31911041 (C.D. Cal. Feb. 22, 2002) (granting plaintiff $50,000 in actual damages after defendant refused to rent to plaintiff because of plaintiff's skin color.)

1    Defendants contend Patterson should not be awarded these damages because he failed to

2 mitigate his injury.  Yet courts have mostly held that there is "no requirement that [p]laintiff

3 mitigate damages when he is merely seeking statutory damages."  *Langer v. McHale,* No.

4 13CV2721, 2014 WL 5422973 at *4 (S.D. Cal. Oct. 20, 2014) (citing Cal. Civ. Code § 52(a)).[5]

5 Even if mitigation were required, Patterson did attempt to mitigate throughout the summer of

6 2021 without success.  Patterson told defendants he planned to visit and even offered to help

7 Mercedes Wilson by providing a written email request for accommodation—an offer she

8 declined.  Joint Ex. 1 at PLA 104.  Defendants' repeated failures to respond properly to his

9 ongoing efforts to mitigate led Patterson to file this lawsuit.

10    Plaintiff is entitled to $36,000 in statutory damages.

11    **C.    Punitive Damages**

12    Patterson also seeks punitive damages.  "In an action for the breach of an obligation not

13 arising from contract, where it is proven by clear and convincing evidence that the defendant has

14 been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may

15 recover damages for the sake of example and by way of punishing the defendant."  Cal. Civ.

16 Code § 3294(a).  However, "an employer shall not be liable for [punitive] damages . . . unless the

17 employer had advance knowledge of the unfitness of the employee and employed him or her with

18 a conscious disregard of the rights and safety of others or authorized or ratified the wrongful

19 conduct . . . ." *Id.* § 3294(b).  For corporate employers, the person showing conscious disregard of

20 the rights of others must be an "officer, director, or managing agent."  *Id.*  Managing agents are

21 corporate employees who "exercise substantial independent authority and judgment over

22 decisions that ultimately determine corporate policy."  *White v. Ultramar, Inc.*, 21 Cal. 4th 563,

23 573 (1999).

---

[5] The only exception, which does not apply here, is for "construction-related" accessibility cases that fall under California Civil Code section 55.56.  In those cases, some courts have declined to award statutory damages for every violation of the Unruh Act if they determined the plaintiff was "stacking" the claims, such as by visiting a restaurant repeatedly without providing notice of an alleged violation.  *See, e.g., Yates v. Vishal Corp.*, No. 11-cv-00643, 2013 WL 6073516 at *4 (N.D. Cal. Nov. 18, 2013).

1    Patterson has not proven a specific managing agent consciously disregarded his rights.  He

2    argues defendants "were on alert over and over and over again, and there were multiple violations

3    that were had here."  Trial Tr. Day Two at 202: 9–11.  But Patterson did not show Bushek created

4    the policies or had discretion to change them.  *See id.* at 83:14–25.  Further, Patterson did not

5    show Bushek knew about Patterson's requests in the summer and fall of 2021.  *See id.* at 54:13–

6    18.  He only showed Bushek knew about the call center's failed attempts in response to

7    Patterson's requests by reviewing transcripts of the exchanges for trial.  *See id.*  Further, Bushek

8    was not Mercedes Wilson's supervisor; she worked directly for Six Flags Discovery Kingdom.

9    *See id.* at 5:18–6:11.  Patterson has not proven Bushek is a managing agent for the purpose of

10   punitive damages.

11   Patterson is not entitled to punitive damages.

12   **D.    Attorneys' Fees**

13   Patterson seeks attorneys' fees and costs.  Under both the ADA, 42 U.S.C. § 12188(a)(1),

14   and the Unruh Act, Cal. Civ. Code § 52(a), plaintiffs who prove liability are entitled to attorneys'

15   fees.  Patterson is directed to file a motion for reasonable attorneys' fees within ninety days of the

16   filed date of this order.

17   **E.    Injunction**

18   Plaintiffs seek an injunction under the ADA, U.S.C. § 12188(a)(1), and under the Unruh

19   Act, Cal. Civ. Code § 52.  "According to well-established principles of equity, a plaintiff seeking

20   a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A

21   plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies

22   available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that,

23   considering the balance of hardships between the plaintiff and defendant, a remedy in equity is

24   warranted; and (4) that the public interest would not be disserved by a permanent injunction."

25   *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  The court considers the totality of

26   the circumstances when determining if a permanent injunction is appropriate.  *La Quinta*

27   *Worldwide, LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 880 (9th Cir. 2014).

1    Patterson is entitled to relief under this standard.  First, Patterson has shown defendants'

2    policies have caused him irreparable harm.  With defendants' deficient training programs still in

3    place, Patterson is likely to continue to be deprived of the accommodations he needs to fully

4    enjoy Six Flags theme parks as provided by law.  Without changes to those policies, Patterson

5    risks continuing to feel not fully included, not able to enjoy many of Six Flags' forms of

6    entertainment, and not being made aware of important safety announcements.  Second, monetary

7    damages will not compensate Patterson due to the nature of the injury.  While damages will

8    compensate Patterson for his past injuries, they will not enable him to fully participate at Six

9    Flags theme parks in the future.  Only an injunction can accomplish that outcome.  Third, the

10   balance of hardships tips in Patterson's favor.  The cost of revisions to Six Flags' training

11   regimen and company policies is small in comparison to the value of preventing similar unlawful

12   discrimination from occurring in the future.  Finally, no evidence shows an injunction would

13   disserve the public.  Rather, public policy strongly favors an injunction, as the purpose of the

14   ADA is to ensure to all "equality of opportunity, full participation, independent living, and

15   economic self-sufficiency."  42 U.S.C. § 12101(a)(7).

16   Defendants contend Patterson is not entitled to equitable relief under a theory of "unclean

17   hands."  Trial Tr. Day Two at 227:5–10.  To prove an unclean hands defense, defendant must

18   show "(1) inequitable conduct by the plaintiff; (2) that the plaintiff's conduct directly relates to

19   the claim which it has asserted against the defendant; and (3) plaintiff's conduct injured the

20   defendant."  *Metro-Goldwyn Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1223

21   (C.D. Cal. 2007) (citations and internal marks omitted).

22   Defendants have not met their burden to show unclean hands.  Their theory is Patterson

23   just wanted a refund for his June purchases. *Id.* at 227:15–18.  It is unclear why it would be

24   inequitable under the circumstances Patterson faced to request a refund.  Regardless, defendants

25   have failed to show Patterson's requests for accommodations in June 2021—which he made

26   before demanding a refund—were illegitimate.  Nor have they connected his desire for a refund

27   to his stated desire to go to the park with the proper accommodations in September, October, and

28   November.

1    The court therefore will grant injunctive relief as provided for in the conclusion of this

2    order.

3        **F.    Declaratory Relief**

4        Patterson also requests declaratory relief.  He asks the court to "declare that Defendants'

5    practices . . . violate the ADA and Unruh Act."  Pl. Trial Br. at 18.  The Declaratory Judgment

6    Act gives this court the power to "declare the rights and other legal relations of any interested

7    party seeking such declaration[.]"  28 U.S.C. § 2201.  The Act "confer[s] on federal courts unique

8    and substantial discretion" to decide the scope of any such declaration.  *Wilton v. Seven Falls Co.*,

9    515 U.S. 277, 286 (1995).  "Declaratory relief should be denied when it will neither serve a useful

10   purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and

11   afford relief from the uncertainty and controversy faced by the parties."  *United States v.*

12   *Washington*, 759 F.2d 1353, 1357 (9th Cir. 1985).

13       The court declines to grant Patterson declaratory relief, as it would serve no useful

14   purpose.  Through its damages relief, the court is determining as a matter of law that defendants

15   violated the Unruh Act in the past.  In granting injunctive relief, the court is declaring defendants

16   have continued to violate the ADA and must permanently come into compliance.  No further

17   declaratory relief is necessary.

18   **V.   CONCLUSION**

19       For the reasons stated above, defendants are liable for violations of the ADA and the

20   Unruh Act.  The court will grant injunctive relief subject to clarifying the terms of such relief, and

21   also award damages and attorneys' fees, as explained below.  The court does not grant declaratory

22   relief.

23       **A.    Injunctive Relief**

24       Under Rule 65(d), "every order granting an injunction . . . must . . . state the reasons why

25   it issued; state its terms specifically; and describe in reasonable detail . . . the act or acts restrained

26   or required."  Fed. R. Civ. P 65(d).  Within forty-five (45) days of the filed date of this order,

27   Patterson will submit a proposed injunction that specifically addresses the following issues.

19

Within fourteen days of Patterson's filing of his proposed injunction, defendants may respond, and within seven days of any response, Patterson may file a reply.  Patterson's proposal must clarify the following with appropriately detailed language satisfying the requirements applicable to an injunction and providing for reporting requirements to the court to confirm implementation:

- Provisions to require that defendants "[u]pon request make good faith efforts to provide ASL interpreters for deaf and hard of hearing guests."  Pl. Trial Br. at 23. The language must define "good faith" and specify how defendants will implement the new policy.

- Provisions to require comprehensive staff training on ADA compliance and handling of ASL interpreter requests  *Id.*

- Provisions to "empower[] staff from both local and national customer service offices to forward requests for interpreters to appropriate staff members to secure sign language interpreter services." *Id.,*

- Provisions to  "[e]stablish contracts with ASL interpretation services to ensure timely provision of interpreters."  *Id.*

- Provisions to "[c]onduct regular internal audits [for] ADA compliance and accommodation practices."  *Id.*

The parties shall meet and confer on the issues above and Patterson will submit a proposed injunction to the court within **forty-five days** of the filed date of this order.  Defendants shall submit a response, if any, within **fourteen days** of the submission of Patterson's proposed injunction, and Patterson a reply, if any, within **seven days** thereafter at which point the matter will be submitted unless the court sets a hearing to cover questions it has based on the parties' filings.

### B.    Damages

The court awards Patterson $18,209.88 in actual damages and $36,000 in statutory damages.  The court awards no punitive damages.  Patterson's proposed order on injunctive relief also shall memorialize these amounts and provide a schedule for payment.

1    **C.    Attorneys' Fees**

2    The court awards attorneys' fees to Patterson in an amount to be determined.  Patterson shall

3    file a motion seeking fees within **ninety days** of the filed date of this order.

4         IT IS SO ORDERED.

5    DATED:  November 15, 2024.

SENIOR UNITED STATES DISTRICT JUDGE